DAVID B. GOLUBCHIK (State Bar No. 185520)
dbg@lnbyb.com
J.P. FRITZ (State Bar No. 245240)
jpf@lnbyb.com
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244

Proposed Attorneys for Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>**SHILO INN, KILLEEN, LLC**,<br><br>          Debtor and Debtor in Possession, | **Case No.: 2:10-bk-62057-VZ**<br><br>**Chapter 11 Case**<br><br>**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO: (A) USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; AND (B) BORROW MONEY ON A SECURED BASIS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Master Declarations of Mark S. Hemstreet and Christopher Campbell in Support Thereof Filed Concurrently Herewith]<br><br><u>Hearing:</u><br>Date:   December 9, 2010<br>Time:  11:00 a.m.<br>Ctrm:   255 East Temple Street<br>          Courtroom 1368<br>          Los Angeles, CA 90012 |

1

## **SUMMARY**

Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, 11 U.S.C. §§ 363(c), 364(b) and 503(b)(1), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Shilo Inn, Killeen, LLC, (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case, hereby moves, on an emergency basis (the "Motion"), for entry of an order authorizing the Debtor to (A) use cash collateral on an emergency interim basis pending a final hearing in accordance with the Debtor's operating budget (the "Budget"), a copy of which is attached as **Exhibit "4"** to the annexed Master Declaration of Christopher Campbell ("Master Declaration"), and (B) enter into a credit line agreement, in an amount not to exceed $100,000.00 from Shilo Franchise International, LLC, on a secured basis to cover possible shortfalls in operations.

The Debtor operates a 160 all-suite full-service hotel located in Killeen, Texas (the "Hotel") pursuant to a franchise agreement with Shilo Franchise International, LLC ("SFI"). The Hotel is a full-service all-suites hotel with half the suites being full kitchen suite units. The Shilo hotel amenities includes a guest hospitality lounge, business center, large meeting and banquet facilities, indoor pool and spa, fitness center, steam room, sauna, as well as an outdoor spa, offices, highly acclaimed restaurant, lounge and one of the only deluxe cigar bars in the Killeen area. Based on reduced occupancy, revenue and cash flow suffered, making the Debtor unable to remain current with its regular obligations to its primary secured creditor, Cathay Bank ("Cathay"). The Debtor used best efforts to negotiate a consensual forbearance agreement. Unfortunately, Cathay decided to take an aggressive approach and commenced judicial foreclosure proceedings with a sale scheduled for December 7, 2010.

Publicity regarding the repeated foreclosure filings and receivership action has already caused senseless financial harm to the Hotel and its operations. Vendors are losing faith in the Debtor ,and Hotel employees are concerned about job security. Guest services have also suffered, prejudicing the Hotel as well as the "Shilo Inns" good franchise brand identity and reputation.

Notwithstanding the foregoing, the Debtor continued to try to negotiate with Cathay in good faith, and, on two different occasions and after paying $250,000 to Cathay, the Debtor believed that an agreement had been reached on forbearance. The Debtor provided Cathay with requested documents and addressed all concerns raised by Cathay. The Debtor was of the belief that Cathay would welcome continued operations by the Debtor, especially when the cash flow shortfalls of the Debtor were funded through assets which were not subject to Cathay's security interest. Based on such discussions, it became evident that Cathay was not interested in reaching a resolution prior to a foreclosure sale of the Hotel scheduled for December 7, 2010. In order to avoid continued harm to the Hotel, employee morale and likely irreparable harm to creditors in the event of a foreclosure, the Debtor determined that the commencement of this case was necessary and proper.

Pursuant to the Motion, the Debtor seeks Court authority to use cash collateral in order to pay the expenses of maintaining and operating the Hotel, as set forth in the Budget. The Budget reflects the Debtor's ordinary and necessary operating expenses that must be paid postpetition to preserve the Debtor's business. While the Budget represents the Debtor's best estimate of such expenses, the needs of the business may fluctuate. Thus, the Debtor seeks authority to deviate from the total expenses contained in the Budget by no more than 15%, on a cumulative basis, and to deviate by category (provided the Debtor does not pay expenses outside any of the categories) without the need for further Court order.

The Debtor submits that Cathay is adequately protected by the use of cash collateral by an equity cushion of approximately 32.3%. In addition, Cathay will be further protected by the continuing management and operation of the Hotel, thereby preserving the value of its collateral.

On the other hand, if the Debtor is not permitted to use its cash collateral to maintain and operate the Hotel, it is a virtual certainty that this estate will be liquidated. Specifically, without use of cash collateral and the ability to operate, existing guests will not receive services and will depart, canceling existing charges. Moreover, without use of cash collateral, future reservations will also be cancelled. Even if the Debtor does not have use of cash collateral on a limited

time basis, the public perception associated with the foregoing will certainly hurt, if not eviscerate, the Debtor's business, thereby reducing the value of the estate and potential recovery to creditors.

**ADDITIONAL INFORMATION**

This Motion is based upon Local Bankruptcy Rules 2081-1(a)(9), 4001-2, and 9075-1, 11 U.S.C. §§ 363(c) and 364(c)(3) and Bankruptcy Rules 4001 and 9014, the supporting Memorandum of Points and Authorities and Master Declaration of Christopher Campbell and Mark S. Hemstreet filed concurrently herewith, the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court. The Debtor submits that the setting of the hearing on this Motion on an emergency basis is warranted given the critical need to fund operations of an active Hotel operation.

Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), while the Court cannot conduct a final hearing on this Motion earlier than fourteen (14) days after service of this Motion, the Court may conduct a preliminary hearing before such 14-day period expires to enable the Debtor to use cash collateral and obtain post-petition financing as is necessary to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing. For the reasons noted herein and in the accompanying Memorandum of Points and Authorities, the Debtor must be able to pay expenses in accordance with the Budget pending a final hearing in order to avoid immediate and irreparable harm to the Debtor's business and its bankruptcy estate.

As set forth in detail in the accompanying Memorandum of Points and Authorities, the proposed use of cash collateral does not include any of the provisions set forth in Bankruptcy Rule 4001(c)(1)(B)(i) – (xi) or Local Bankruptcy Rule 4001-2(b).

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtor served by overnight mail a copy of this Motion and all supportive papers (including notice of the hearing) upon the Office of the United States Trustee, the Secured Creditors and the Debtor's 20 largest unsecured creditors.

/ / /

1     **WHEREFORE,** the Debtor respectfully requests that this Court enter an order:

2     (1)    affirming the adequacy of the Notice given herein;

3     (2)    granting the Motion on an interim basis pending a final hearing thereon;

4     (3)    authorizing the Debtor to use cash collateral to pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by not more than 15%, on a cumulative basis;

7     (4)    authorizing the Debtor to borrow money, pursuant to a credit line agreement in the amount of $100,000, on a secured basis from SFI as may be necessary to cover any operating shortages set forth in the Budget;

10     (5)    setting a final hearing on the Motion; and

11     (6)    granting such other and further relief as the Court deems just and proper under the circumstances.

Dated: December 6, 2010                    SHILO INN, KILLEEN, LLC

By:   /s/ David B. Golubchik  
      DAVID B. GOLUBCHIK
      J.P. FRITZ
      LEVENE, NEALE, BENDER, YOO
        & BRILL L.L.P.
      Proposed Attorneys for Debtor and
      Debtor in Possession

# **MEMORANDUM OF POINTS AND AUTHORITIES**

## **I.**

## **STATEMENT OF FACTS**

1. Shilo Inn, Killeen, LLC, the debtor and debtor in possession herein ("Debtor"), commenced this case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code on December 6, 2010. The Debtor continues to operate its business and manage its financial affairs as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.

**A.    Background.**

2. The Debtor operates a 160 all-suite full-service hotel located in Killeen, Texas (the "Hotel") pursuant to a franchise agreement with Shilo Franchise International, LLC ("SFI"). The Hotel is a full-service all-suites hotel with half the suites being full kitchen suite units. The Shilo hotel amenities includes a guest hospitality lounge, business center, large meeting and banquet facilities, indoor pool and spa, fitness center, steam room, sauna, as well as an outdoor spa, offices, highly acclaimed restaurant, lounge and one of the only deluxe cigar bars in the Killeen area.

3. Mark S. Hemstreet has been the proud owner and president of the Shilo Inn Suites Hotel chain since 1974. Today, there are 41 Shilo Inn hotels across ten western states. Mr. Hemstreet personally developed this particular Killeen 160 all-suite, full service Hotel in 2007.

4. The Hotel has enjoyed historical success as a stand-alone business. While the Hotel's ideal location adjacent to the Killeen Conference and Civic Center and extensive meeting and banquet facilities have made it a "go-to" location in the greater Killeen area, in 2009 the Hotel suffered reduced occupancy and revenues as a result of the slowdown in the general economy, especially the tourist and conference industry, during this long, deep historical recession. Although the Hotel has begun to recover in 2010 with revenues up year-to-date through the end of November 2010, room revenues are still down approximately 3% from

///

their 2008 levels for the first 11 months of 2010 compared to the same 11-month period in 2008.

5.     The Hotel is truly the superior lodging facility in Killeen, having won multiple awards and distinctions in the fairly brief time since opening. The Hotel opened mid-March, 2007 and, in July 2008, it was chosen by Trip Advisor users as the #1 hotel in the entire state of Texas. In addition, the Hotel was given the distinction of being among the best hotels in Central Texas in the Killeen Daily Herald reader's poll, and the Shilo-Mark Restaurant at the Hotel has likewise received awards and recognition as a premier dining location in Killeen.

6.     Cathay Bank ("Cathay") originated the primary loan with the Debtor on or about March 20, 2006. On or about December 11, 2007, Cathay issued a replacement loan in the amount of $15.5 million to the Debtor. The Debtor made timely monthly payments to Cathay until late 2009 when the declines in annual room revenue of approximately 6.5% caused a reduction in cash flow.

7.     The Debtor maintained close communication with Cathay in early 2010 regarding this loan and the obligation on an affiliated entity and related Chapter 11 debtor, Shilo Inn, Diamond Bar, LLC (Case No. 2:10-bk-60884-VZ), while also working out an extension and modification agreement on six additional loans with six separate affiliated entities (Shilo Inn The Dalles, LLC; Shilo Inn Warrenton, LLC; Shilo Inn, Newport, LLC; Shilo Inn Richland, LLC; Shilo Inn, Beaverton, LLC; and Shilo Inn, Washington Square, LLC (collectively hereinafter referred to as the "Shilo Six"). Cathay and the Shilo Six reached a resolution on the six loans around March of 2010, and based on statements made by Cathay at the time, the Debtor and Shilo Inn, Diamond Bar, LLC believed they would be able to similarly reach an agreement on the remaining two loan modifications with Cathay. During the time of the discussions, and due to the revenue declines and cash flow shortfalls from these two properties combined, the Debtor and Shilo Inn, Diamond Bar, LLC were unable to make regular monthly debt payments on either loan pending the expected final resolution and agreement, which was ultimately not reached prior to the filing of this case.

8.     The Debtor used best efforts to negotiate a consensual forbearance agreement and, in fact, on two different occasions and after paying $250,000 to Cathay, clearly believed that an agreement had been reached. The Debtor provided Cathay with requested documents and addressed all concerns raised by Cathay. The Debtor was of the belief that Cathay would welcome continued operations by the Debtor, especially when the cash flow shortfalls of the Debtor were funded through assets which were not subject to Cathay's security interest. Unfortunately, Cathay decided to take an aggressive approach and commenced judicial foreclosure proceedings, including initially seeking the appointment of a receiver over the Hotel, which was withdrawn by Cathay the day prior to the hearing on the receivership action scheduled for December 3, 2010.

9.     Publicity regarding the repeated foreclosure filings and receivership action has already caused senseless financial harm to the Hotel and its operations. Vendors are losing faith in the Debtor, and Hotel employees are concerned about job security. Guest services have also suffered, prejudicing the Hotel as well as the "Shilo Inns" good franchise brand identity and reputation.

10.    Notwithstanding the foregoing, the Debtor continued to try to negotiate with Cathay in good faith up to the filing of this petition. Based on such discussions, it became evident that Cathay was not interested in reaching a resolution prior to a foreclosure sale of the Hotel scheduled for December 7, 2010. In order to avoid continued harm to the Hotel, employee morale and likely irreparable harm to creditors in the event of a foreclosure, the Debtor was left with no other practical alternative and determined that the commencement of this case was necessary and proper in order to preserve the value of the Hotel for the benefit of all creditors, employees, customers and other parties in interest.

**B.     Assets.**

11.    The Debtor's primary asset is the Hotel. In 2007, Cathay obtained an appraisal of the Hotel, pursuant to which the fair market value of the Hotel was determined to be in the range of $23,060,000 to $25,400,000. A true and correct copy of the foregoing appraisal is

attached to the Master Declaration as **Exhibit "1"**.  The Debtor believes that the market has deteriorated somewhat since 2007 but that the value of the Hotel is at least $22,000,000.

12.     In addition to the foregoing, the Debtor has other assets, which are identified in Schedule B – Personal Property, a true and correct copy of which is attached to the Master Declaration as **Exhibit "2"**.

13.     Finally, attached to the Master Declaration as **Exhibit "3"** is a copy of the Debtor's latest available Balance Sheet, dated as of September 30, 2010.  The Balance Sheet lists that market value of the Debtor's assets at $15,734,489.00.

**C.    Secured Claim**

14.     Cathay asserts a first priority security interest in the Debtor's assets to secure an obligation in the amount of approximately $14,902,868.33.

**D.    Need For Use of Cash Collateral and Post-Petition Financing**

15.     Pursuant to the Motion, the Debtor seeks Court authority to use cash collateral in order to pay the expenses of maintaining and operating the Business, as set forth in the Budget, a copy of which is attached as **Exhibit "4"** to the Master Declaration.  The Budget reflects the Debtor's ordinary and necessary operating expenses that must be paid postpetition to preserve the Debtor's business.  While the Budget represents the Debtor's best estimate of such expenses, the needs of the business may fluctuate.  Thus, the Debtor seeks authority to deviate from the total expenses contained in the Budget by no more than 15% on a cumulative basis without the need for further Court order.

16.     As is evident in the Budget, the Debtor anticipates certain cash shortfalls from operations in the near future.  Cashflow shortfalls are proposed to be covered by a Credit Line ("Credit Line") in the amount of $100,000 to be offered to the Debtor by Shilo Franchise International, LLC ("SFI") in accordance with the Term Sheet attached to the Master Declaration as **Exhibit "5"**.

17.     Notwithstanding the foregoing, the Debtor is confident that its future is bright.  Room revenues have increased year-over-year for 2010 compared to 2009, and the Debtor is

confident that with a sustained recovery in the general economy, Killeen and the Killeen Shilo Inn will continue to gain in revenues and operating profit. The Debtor believes that the worst period of the recession has come to an end and its performance year-over-year supports its belief that operations should continue to improve in the future.

18. The Debtor believes that the current valuation of the Hotel on a going-concern basis, its facilities and improved performance provides adequate protection to Cathay. The Debtor's continued operations, including the funding of any shortfalls through a junior security interest, will further protect Cathay.

19. On the other hand, if the Debtor is not permitted to use its cash collateral to maintain and operate the Hotel, it is a virtual certainty that this estate will be liquidated. Specifically, without use of cash collateral and the ability to operate, existing guests will not receive services and will depart, canceling existing charges. Moreover, without use of cash collateral, future reservations will also be cancelled. Even if the Debtor does not have use of cash collateral on a limited time basis, the public perception associated with the foregoing will certainly hurt, if not eviscerate, the Debtor's business, thereby reducing the value of the estate and potential recovery to creditors.

**E.  Compliance With Rule 4001(c) of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 4001-2.**

20. Pursuant to Rule 4001(c)(1)(B) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and Local Bankruptcy Rule 4001-2(b) and (d), the Debtor submits that the relief requested by the Debtor pertaining to the Debtor's use of cash collateral and borrowing of money do not contain any of the following provisions:

| **Provision** | |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |

| **Provision** | |
|---|---|
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the Debtor of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the Debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the Debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

///

11

**II.**

**DISCUSSION**

**A.    The Debtor Must Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve The Hotel In Accordance With The Budget.**

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C.§ 363(c)(l). A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363. See 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ." 11 U.S.C. §363(a). Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A) each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

See 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); In re Tucson Industrial Partners, 129 B.R. 614 (9th Cir. BAP 1991). In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of

1 reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash
2 collateral is necessary to operate a business." In re Dynaco Corporation, 162 B.R. 389 (Bankr.
3 D.N.H. 1993), quoting In re Stein, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

4 The only current source of revenue available to the Debtor to use to maintain and operate
5 the Hotel are the revenues being generated from the Hotel rooms and related amenities. If the
6 Debtor is not permitted to use its cash collateral to maintain and operate the Hotel, it is a virtual
7 certainty that this estate will be liquidated. Specifically, without use of cash collateral and the
8 ability to operate, existing guests will not receive services and will depart, canceling existing
9 charges. Moreover, without use of cash collateral, future reservations will also be cancelled.
10 Even if the Debtor does not have use of cash collateral on a limited time basis, the public
11 perception associated with the foregoing will certainly hurt, if not eviscerate, the Debtor's
12 business, thereby reducing the value of the estate and potential recovery to creditors.

13 The operating expenses that the Debtor must be able to pay during the pendency of this
14 case are set forth in the Budget. The Budget reflects the Debtor's ordinary and necessary operating
15 expenses that must be paid postpetition to preserve the Debtor's business. While the Budget
16 represents the Debtor's best estimate of such expenses, the needs of the business may fluctuate.
17 Thus, the Debtor seeks authority to deviate from the total expenses contained in the Budget by no
18 more than 15% on a cumulative basis without the need for further Court order.

19 **B.    Cathay Is Adequately Protected.**

20 To the extent that an entity has a valid security interest in the revenues generated by
21 property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy
22 Code. Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured
23 creditor's cash collateral if the secured creditor is adequately protected. In re Mellor, 734 F.2d
24 1396, 1400 (9th Cir. 1984). See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In
25 re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

26 Pursuant to the Supreme Court case of United Savings Association v. Timbers of Inwood
27 Forest Associates, 108 S.Ct. 626, 629 (1988) and subsequent case law, the property interest that a
28

13

debtor must adequately protect pursuant to Sections 361(1) and (2) of the Bankruptcy Code is only the value of the lien that secures the creditor's claim. 108 S.Ct. at 630. See also McCombs, Id., at 266. Section 506(a) "limit[s] the secured status of a creditor (*i.e.*, the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral." McCombs, Id., at 266.

In the case of an oversecured creditor, Section 506(a) and Timbers mandate that "there is no lack of adequate protection [even where there is] a decline in collateral value" provided the secured creditor remains oversecured. McCombs, Id., at 266; In re Chauncy Street Assoc. Ltd. Partnership, 107 B.R. 7, 8 (Bankr. D. Mass 1989). In this case, the Alleged Secured Creditors are adequately protected by a substantial equity cushion, replacement lien and by the continued operation of the Debtor's business.

   1.  Cathay Will Be Adequately Protected by a Substantial Equity Cushion.

As noted above, to the extent that an entity, other than the Debtor, has a valid security interest in the revenues generated by the operation of the Debtor's business, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy Code. 11 U.S.C. §363(a). Pursuant to Section 363(c)(2), the Court may authorize the Debtor to use a secured creditor's cash collateral if the secured creditor is adequately protected. In re Mellor at 1400. See also In re O'Connor at 1398; In re McCombs at 265.

It is well established that the existence of an equity cushion alone can constitute adequate protection to a secured creditor when a debtor seeks to use cash collateral. In re Mellor, 734 F.2d 1396 (9th Cir. 1984). In Mellor, the Ninth Circuit held that a 20% equity cushion constituted adequate protection as a matter of law. Id. at 140-01. The Ninth Circuit indicated that a cushion of less than 20% could also constitute adequate protection and cited with approval decisions holding that equity cushions of between 10% and 20% constituted adequate protection. Id., (citing In re McGowan, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (holding that a 10% cushion is adequate protection); In re Rogers Development Corp., 2 B.R. 679, 685 (Bankr. E. D. Va. 1980) (equity cushion of approximately 15% to 20% was adequate protection notwithstanding

that the debtors had no equity in the property); see also, In re Hawaiian Pacific Industries, 17 B.R. 670, 673 (Bankr. D. Hawaii 1982) (15% cushion constituted adequate protection).

In this case, Cathay is owed approximately $14,902,868.33, while the value of the Hotel is approximately $22,000,000.00. This translates to an equity cushion of approximately 32.3%. As a result, Cathay is adequately protected in accordance with the Mellor standard.

2. Cathay Will Be Further Adequately Protected by the Continued Operation of the Debtor's Business.

The preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988). See also In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982). The Stein Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. See also, In re McCombs, supra, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

As reflected in the Budget, the Debtor's continued operation and maintenance of the Hotel will adequately protect Cathay as the Debtor will continue to generate revenue and preserve the value of the Hotel. Moreover, SFI has committed to funding possible shortfalls in operations on a junior secured basis, which greatly benefits the Secured Creditors by ensuring continued operations without disruptions. Other Courts have determined that the Debtor's continued business operations can constitute the adequate protection of a secured creditor. See Matter of Pursuit Athletic Footwear, Inc., 193 B.R. 713 (Bankr. D. Del. 1996); In re Newark Airport/Hotel Ltd. Partnership, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); In re Immenhausen Corp., 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

///

Additionally, in determining adequate protection, Courts have stressed the importance of promoting a debtor's reorganization.

In <u>In re O'Connor</u>, <u>supra</u>, the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter ll proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

The use of cash collateral is critical to the Debtor's ability to implement an effective reorganization strategy for the benefit of all creditors. As demonstrated herein, the use of the Debtor's cash collateral, in accordance with the Budget, will preserve and maximize the Debtor's assets (in particular, the Hotel) for the benefit of the estate and all creditors. If the Debtor is not permitted to use its cash collateral to maintain and operate the Hotel, it is a virtual certainty that this estate will be liquidated. Specifically, without use of cash collateral and the ability to operate, existing guests will not receive services and will depart, canceling existing charges. Moreover, without use of cash collateral, future reservations will also be cancelled. Even if the Debtor does not have use of cash collateral on a limited time basis, the public perception associated with the foregoing will certainly hurt, if not eviscerate, the Debtor's business, thereby reducing the value of the estate and potential recovery to creditors.

On the other hand, if the Debtor is authorized to use its cash collateral, the Debtor will be able to continue maintaining the Hotel and generating cash flow so that the Debtor can simultaneously pursue longer term strategies for the restructuring of its financial affairs. Clearly, the use of cash collateral will only enhance the prospect of the Debtor's reorganization.

///

**C.    The Debtor Should Be Authorized to Obtain Debtor-in-Possession Financing from SFI to Cover Any Operating Shortages.**

Pursuant to Sections 364(c)(3) of the Bankruptcy Code, the Debtor requests authority to borrow up to $100,000 on a junior basis from SFI to cover potential shortfalls in operations during the bankruptcy period. The loan will accrue interest at the rate of 5% per annum.

Section 364 of the Bankruptcy Code is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period. In re Photo Promotion Associates, Inc., 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989). Therefore, where a trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under certain carefully proscribed conditions. In re T.M. Sweeney & Sons LTL Services, Inc., 131 B.R. 984, 989 (Bankr.N.D.Ill.1991). For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d). In re Photo Promotion Associates, Inc., 87 B.R. at 839.

Section 364(c) of the Bankruptcy Code also enumerates certain incentives that a court may grant to post-petition lenders. The Section 364(c) list, however, is not exhaustive. Courts frequently have authorized the use of inducements not specified in the statute. See, e.g., In re Ellingsen MacLean Oil Co., 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); In re Defender Drug Stores, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), aff'd 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364"); In re Antico Mfg. Co., 31 B.R. 103 (Bankr. E.D.N.Y. 1983) (authorizing lien on pre-petition collateral to secure post-petition indebtedness).

///

Two factors courts consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit per 11 U.S.C. § 364(b), *i.e.*, by allowing a lender only an administrative claim per 11 U.S.C. § 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); see also In re Aqua Assoc., 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

1. <u>The Debtor Is Unable to Obtain Unsecured Credit</u>.

Section 364(d)(1)(A) does not impose upon a debtor-in-possession the onerous duty to seek credit from every possible lender before concluding that such credit is unavailable. See In re Snowshoe Co., Inc., 789 F. 2d 1085, 1089 (4th Cir.1986). Instead, a good faith effort to obtain less burdensome credit is required of the debtor.

While the Debtor has researched the possibility of obtaining credit on an unsecured basis, none has been secured. Moreover, based on the circumstances of this case, the Debtor believes that it is unrealistic that it will be able to obtain unsecured credit.

SFI has agreed to provide financing on a junior secured basis, which does not impair Cathay's interests herein. Under these circumstances, the Debtor believes that the terms of the proposed Line of Credit are very favorable to the Debtor and the estate, and essential to the Debtor's business operations and reorganization efforts.

2. <u>The Terms of the Proposed Post-Petition Financing Are Fair, Reasonable and Adequate</u>.

The Debtor submits that the terms of the Line of Credit from SFI are fair, reasonable and adequate. While in determining whether to approve such a transaction, a Court is authorized to act in its informed discretion, In re Ames Department Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990), the Court should give broad deference to the business decision of a chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds. Richmond Leasing Co. v. Capital Bank N.A., 762 F.2d 1303, 1311 (5th

Cir.1985). As the court noted in <u>Ames Dept. Stores</u>, "the court's discretion under section 364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be exercised . . . ." <u>In re Ames Dept. Stores, Inc.</u>, 115 B.R. at 40.

The Debtor, in the exercise of its business judgment, has concluded that borrowing this money from SFI is in the clear best interests of the Debtor's estate because without such funds, the Debtor may have difficulty funding possible shortfalls in operations, especially during the holiday period.

Specifically, with the Line of Credit, the Debtor would be able to cover any shortfalls in operations, possess cash that could be utilized for ordinary, day to day business expenses, and marketing. The infusion of cash will permit the Debtor to operate more efficiently and generate revenue for the benefit of the estate and all creditors, and be able to meet the demands of guests while attracting new ones, for the benefit of the Debtor's estate.

The Line of Credit will allow the Debtor to sustain operations at capacity while providing an appropriate cushion in a situation where the Debtor is in need of additional operating capital to generate more revenues. The terms of the Line of Credit are simple, fair and reasonable, and are crafted for the narrow purpose for which the Line of Credit is being requested. The Line of Credit is thus a favorable financing arrangement to the Debtor which has been proposed for the benefit of the Debtor's estate. For these reasons, the Court should approve the Line of Credit for the Debtor.

## III.

## **CONCLUSION**

Based on the foregoing, the Debtor submits that approval by this Court of the Motion is in the best interests of the Debtor's estate and respectfully requests that the Court enter an order:

(1) affirming the adequacy of the Notice given herein;

(2) granting the Motion on an interim basis pending a final hearing thereon;

(3) authorizing the Debtor to use cash collateral to pay all of the expenses set forth in the Budget, with authority to deviate from the line items contained in the Budget by not more than 15%, on a cumulative basis;

(4) authorizing the Debtor to borrow money, pursuant to a credit line agreement in the amount of $100,000, on a secured basis from SFI as may be necessary to cover any operating shortages set forth in the Budget;

(5) setting a final hearing on the Motion; and

(6) granting such other and further relief as the Court deems just and proper under the circumstances.

Dated: December 6, 2010    SHILO INN, KILLEEN, LLC

By: /s/ David B. Golubchik
    DAVID B. GOLUBCHIK
    J.P. FRITZ
    LEVENE, NEALE, BENDER, YOO
      & BRILL L.L.P.
    Proposed Attorneys for Debtor and
    Debtor in Possession