DAVID B. GOLUBCHIK (State Bar No. 185520)
dbg@lnbyb.com
J.P. FRITZ (State Bar No. 245240)
jpf@lnbyb.com
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244

Attorneys for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>**SHILO INN, KILLEEN, LLC,**<br><br>Debtor and Debtor in Possession, | ) Case No.: 2:10-bk-62057-VZ<br>)<br>) Chapter 11 Case<br>)<br>)<br>)<br>) **DISCLOSURE STATEMENT AND**<br>) **PLAN OF REORGANIZATION FOR**<br>) **DEBTOR SHILO INN, KILLEEN, LLC**<br>)<br>)<br>)<br>) <u>Disclosure Statement Hearing:</u><br>) Date:    March 24, 2011<br>) Time:    1:30 p.m.<br>) Ctrm:    255 East Temple Street<br>)            Courtroom 1368<br>)            Los Angeles, CA 90012<br>)<br>)<br>)<br>) <u>Plan Confirmation Hearing:</u><br>) Date:    To be set<br>) Time:    To be set<br>) Ctrm:    255 East Temple Street<br>)            Courtroom 1368<br>)            Los Angeles, CA 90012<br>)<br>)<br>) |

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................. 1

II. GENERAL DISCLAIMER AND VOTING PROCEDURE ................................. 1

III. WHO MAY OBJECT TO CONFIRMATION OF THE PLAN ........................... 2

IV. WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN ............................. 2

V. VOTES NECESSARY TO CONFIRM THE PLAN ........................................... 4

VI. INFORMATION REGARDING VOTING IN THIS CASE ................................ 5

VII. DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND
EVENTS PRECIPITATING BANKRUPTCY FILING ..................................... 5

VIII. CRITICAL PLAN PROVISIONS ..................................................................... 10

IX. DESCRIPTION AND TREATMENT OF CLAIMS ......................................... 10

X. SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS ........... 19

XI. FINANCIAL RECORDS TO ASSIST IN DETERMINING WHETHER
PROPOSED PAYMENT IS FEASIBLE .......................................................... 20

XII. ASSETS AND LIABILITIES OF THE ESTATE ............................................. 20

XIII. TREATMENT OF NONCONSENTING CLASSES .......................................... 20

XIV. TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING
CLASS (CHAPTER 7 LIQUIDATION ANALYSIS) ...................................... 21

XV. FUTURE DEBTOR ......................................................................................... 24

XVI. SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF CONTRACTS
AND LEASES; OTHER PROVISIONS ........................................................... 28

XVII. BANKRUPTCY PROCEEDINGS .................................................................... 29

XVIII. TAX CONSEQUENCES OF PLAN .................................................................. 29

XIX. EFFECT OF CONFIRMATION OF PLAN ...................................................... 30

XX. DECLARATION IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN . 33

i

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES**

11 U.S.C. § 201 ................................................................................................ 14
11 U.S.C. § 301 ................................................................................................ 14
11 U.S.C. § 303 ................................................................................................ 14
11 U.S.C. § 365(b)(1)(A) .................................................................................. 3
11 U.S.C. § 366(b) ........................................................................................... 29
11 U.S.C. § 523(a)(2)(A) .................................................................................. 31
11 U.S.C. § 523(a)(2)(B) .................................................................................. 31
11 U.S.C. § 1115 .............................................................................................. 21
11 U.S.C. § 1122(b) ......................................................................................... 14
11 U.S.C. § 1123(b)(3) ..................................................................................... 31
11 U.S.C. § 1127 .............................................................................................. 31
11 U.S.C. § 1129(b)(2)(B)(ii) .......................................................................... 21
11 U.S.C. § 1141(d)(3) ..................................................................................... 31

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 3018(d) .................................................................................. 4

## I.    INTRODUCTION

On December 6, 2010 (the "Petition Date"), Shilo Inn, Killeen, LLC ("Debtor" or "Proponent"), filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code ("Code"). The document you are reading is <u>both</u> the Plan of Reorganization ("Plan") and the Disclosure Statement. The Debtor has proposed the Plan to treat the claims of the Debtor's creditors and, if applicable, the interests of shareholders or partners and to reorganize the Debtor's business affairs.   Pursuant to the Plan, the Debtor proposes to pay all claims in full (100%), unless otherwise agreed to with the claimholder, with unsecured claims to be paid over a period of four (4) months from the Effective Date, as that term is defined below.   A disclosure statement describes the assumptions that underlie the Plan and how the Plan will be executed.   The Bankruptcy Court ("Court") has approved the form of this document as an adequate disclosure statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan.   The Court has not yet confirmed the Plan, which means the terms of the Plan are not now binding on anyone.

The Proponent has reserved _____, 2011 in Courtroom 1368 for a hearing to determine whether the Court will confirm the Plan.

Any interested party desiring further information should contact:

Levene, Neale, Bender, Yoo & Brill L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Tel: (310) 229-1234
Fax: (310) 229-1244
Attention: David B. Golubchik & J.P. Fritz

## II.    GENERAL DISCLAIMER AND VOTING PROCEDURE

PLEASE READ THIS DOCUMENT, INCLUDING THE ATTACHED EXHIBITS, CAREFULLY. IT EXPLAINS WHO MAY OBJECT TO CONFIRMATION OF THE PLAN. IT EXPLAINS WHO IS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  IT ALSO TELLS ALL CREDITORS AND ANY SHAREHOLDERS OR PARTNERS WHAT

1

TREATMENT THEY CAN EXPECT TO RECEIVE UNDER THE PLAN, SHOULD THE PLAN BE CONFIRMED BY THE COURT.

THE SOURCES OF FINANCIAL DATA RELIED UPON IN FORMULATING THIS DOCUMENT ARE SET FORTH IN THE DECLARATIONS APPENDED HERETO.  ALL REPRESENTATIONS ARE TRUE TO THE PROPONENT'S BEST KNOWLEDGE.

NO REPRESENTATIONS CONCERNING THE DEBTOR THAT ARE INCONSISTENT WITH ANYTHING CONTAINED HEREIN ARE AUTHORIZED EXCEPT TO THE EXTENT, IF AT ALL, THAT THE COURT ORDERS OTHERWISE.

After carefully reviewing this document and the attached exhibits, please vote on the enclosed ballot and return it in the enclosed envelope.

The Proponent has reserved a hearing date for a hearing to determine whether the Court will confirm the Plan.  Please refer to Section I above for the specific hearing date.  If, after receiving the ballots, it appears that the Proponent has the requisite number of votes required by the Code, the Proponent will file a motion for an order confirming the Plan.

The Motion shall at least be served on all impaired creditors and partners or shareholders who reject the Plan and on the Office of the United States Trustee.  Any opposition to the Motion shall be filed and served on the Proponent and the Committee no later than eleven days prior to the hearing date.  Failure to oppose the confirmation of the Plan may be deemed consent to the Plan's confirmation.

### III.    WHO MAY OBJECT TO CONFIRMATION OF THE PLAN

Any party in interest may object to confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

### IV.    WHO MAY VOTE TO ACCEPT OR REJECT THE PLAN

It requires both an allowed and impaired claim or interest in order to vote either to accept or reject the Plan.  A claim is defined by the Code to include a right to payment from the Debtor.

1  An interest represents an ownership stake in the Debtor.

2  In order to vote a creditor or interest-holder must first have an <u>allowed claim or interest</u>.

3  With the exceptions explained below, a claim is allowed if proof of the claim or interest is

4  properly filed before any bar date and no party in interest has objected, or if the court has entered

5  an order allowing the claim or interest. Please refer to Section VI below for specific information

6  regarding bar dates in this case.

7  Under certain circumstances a creditor may have an allowed claim even if a proof of

8  claim was not filed and the bar date for filing a proof of claim has passed. A claim is deemed

9  allowed if the claim is listed on the Debtor's schedules and is not scheduled as disputed,

10  contingent, or unliquidated. Exhibit "A" contains a list of claims that are not scheduled as

11  disputed, contingent, or unliquidated.

12  Similarly, an interest is deemed allowed if it is shown on the list of equity security

13  holders filed by the Debtor with the court and is not scheduled as disputed.

14  In order to vote, an allowed claim or interest must also be impaired by the Plan.

15  <u>Impaired creditors</u> include those whose legal, equitable, and contractual rights are altered

16  by the Plan, even if the alteration is beneficial to the creditor. A contract provision that entitles a

17  creditor to accelerated payment upon default does not, however, necessarily render the claimant

18  impaired, even if the Debtor defaulted and the Plan does not provide the creditor with accelerated

19  payment. The creditor is deemed unimpaired so long as the Plan cures the default, reinstates the

20  maturity of such claim as it existed before default, compensates for any damages incurred as a

21  result of reasonable reliance upon the acceleration clause, and (except for a default arising from

22  failure to operate a nonresidential lease subject to 11 U.S.C. § 365(b)(1)(A)) compensates for

23  any actual pecuniary loss incurred as a result of any failure to perform a non-monetary

24  obligation.

25  <u>Impaired interest-holders</u> include those whose legal, equitable, and contractual rights are

26  altered by the Plan, even if the alteration is beneficial to the interest holder.

27  There are also some types of claims that the Code requires be treated a certain way. For

28

1   that reason they are considered unimpaired and therefore holders of these claims cannot vote.

2       To summarize, there are two prerequisites to voting: a claim or interest must be both

3   allowed and impaired under the Plan.

4       If a creditor or interest-holder has an allowed and impaired claim or interest, then he or

5   she may vote either to accept or reject the Plan (unimpaired claimants or interest-holders are

6   deemed to have accepted the Plan).  Impaired claims or interests are placed in classes and it is

7   the class that must accept the Plan.  Members of unimpaired classes do not vote, although as

8   stated above, they may object to confirmation of the Plan.  Even if all classes do not vote in favor

9   of the Plan, the Plan may nonetheless be confirmed if the dissenting classes are treated in a

10  manner prescribed by the Code.  Please refer to Section VI below for information regarding

11  impaired and unimpaired classes in this case.

12      Section IX sets forth which claims are in which class.  Secured claims are placed in

13  separate classes from unsecured claims.  Fed. R. Bankr. P. 3018(d) provides: "A creditor whose

14  claim has been allowed in part as a secured claim and in part as an unsecured claim shall be

15  entitled to accept or reject a plan in both capacities."

16

17          **V.    VOTES NECESSARY TO CONFIRM THE PLAN**

18      The Court may confirm the Plan if at least one noninsider impaired class of claims has

19  accepted and certain statutory requirements are met as to both nonconsenting members within a

20  consenting class and as to dissenting classes.  A class of claims has accepted the Plan when more

21  than one-half in number and at least two-thirds in amount of the allowed claims actually voting,

22  vote in favor of the Plan.  A class of interests has accepted the Plan when at least two-thirds in

23  amount of the allowed interests of such class actually voting have accepted it.  It is important to

24  remember that even if the requisite number of votes to confirm the Plan are obtained, the Plan

25  will not bind the parties unless and until the Court makes an independent determination that

26  confirmation is appropriate.  That is the subject of any upcoming confirmation hearing.

27

28

## VI.    INFORMATION REGARDING VOTING IN THIS CASE

The bar date for filing a proof of claim in this case is March 31, 2011.

The bar date for objecting to claims is July 29, 2011, which date has not yet passed as of the filing date of this Plan and Disclosure Statement.

In this case, and based on the descriptions provided above, the Proponent believes that all of the classes 1 through 4 are impaired and therefore entitled to vote.  Class 5 is unimpaired and therefore does not vote.  A party that disputes the Proponent's characterization of its claim or interest as unimpaired may request a finding of impairment from the Court in order to obtain the right to vote.

Ballots must be received by the Proponent, addressed to Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067, Attention:  J.P. Fritz, by _____, 2011.

## VII.    DESCRIPTION OF DEBTOR'S PAST AND FUTURE BUSINESS AND EVENTS PRECIPITATING BANKRUPTCY FILING

The Debtor is a limited liability company formed under the laws of the state of Oregon. The Debtor operates a 160 all-suite full-service hotel located in Killeen, Texas (the "Hotel") pursuant to a franchise agreement with Shilo Franchise International, LLC ("SFI").  The Hotel is a full-service all-suites hotel with half the suites being full kitchen suite units. The Shilo hotel amenities includes  a  guest  hospitality  lounge,  business  center,  large  meeting  and banquet facilities, indoor pool and spa, fitness center, steam room, sauna, as well as an outdoor spa, offices, highly acclaimed restaurant, lounge and one of the only deluxe cigar bars in the Killeen area.

Mark S. Hemstreet has been the proud owner and president of the Shilo Inn Suites Hotel chain since 1974.  Today, there are 41 Shilo Inn hotels across ten western states.    Mr. Hemstreet personally developed this particular Killeen 160 all-suite, full service Hotel in 2007.

The Hotel has enjoyed historical success as a stand-alone business.  While the Hotel's

ideal location adjacent to the Killeen Conference and Civic Center and extensive meeting and banquet facilities have made it a "go-to" location in the greater Killeen area, in 2009 the Hotel suffered reduced occupancy and revenues as a result of the slowdown in the general economy, especially the tourist and conference industry, during this long, deep historical recession. Although the Hotel has begun to recover in 2010 with revenues up year-to-date through the end of November 2010, room revenues are still down approximately 3% from their 2008 levels for the first 11 months of 2010 compared to the same 11-month period in 2008.

The Hotel is truly the superior lodging facility in Killeen, having won multiple awards and distinctions in the fairly brief time since opening. The Hotel opened mid-March, 2007 and, in July 2008, it was chosen by Trip Advisor users as the #1 hotel in the entire state of Texas. In addition, the Hotel was given the distinction of being among the best hotels in Central Texas in the Killeen Daily Herald reader's poll, and the Shilo-Mark Restaurant at the Hotel has likewise received awards and recognition as a premier dining location in Killeen.

What follows is a brief summary of the dates and circumstances that led Debtor to file bankruptcy.

Cathay Bank ("Cathay") originated the primary loan with the Debtor on or about March 20, 2006. On or about December 11, 2007, Cathay issued a replacement loan in the amount of $15.5 million to the Debtor. The Debtor made timely monthly payments to Cathay until late 2009 when the declines in annual room revenue of approximately 6.5% caused a reduction in cash flow.

The Debtor maintained close communication with Cathay in early 2010 regarding this loan and the obligation on an affiliated entity and related Chapter 11 debtor, Shilo Inn, Diamond Bar, LLC (Case No. 2:10-bk-60884-VZ), while also working out an extension and modification agreement on six additional loans with six separate affiliated entities (Shilo Inn The Dalles, LLC; Shilo Inn Warrenton, LLC; Shilo Inn, Newport, LLC; Shilo Inn Richland, LLC; Shilo Inn, Beaverton, LLC; and Shilo Inn, Washington Square, LLC (collectively hereinafter referred to

as the "Shilo Six"). Cathay and the Shilo Six reached a resolution on the six loans around March of 2010, and based on statements made by Cathay at the time, the Debtor and Shilo Inn, Diamond Bar, LLC believed they would be able to similarly reach an agreement on the remaining two loan modifications with Cathay. During the time of the discussions, and due to the revenue declines and cash flow shortfalls from these two properties combined, the Debtor and Shilo Inn, Diamond Bar, LLC were unable to make regular monthly debt payments on either loan pending the expected final resolution and agreement, which was ultimately not reached prior to the filing of this case.

The Debtor used best efforts to negotiate a consensual forbearance agreement and, in fact, on two different occasions and after paying $250,000 to Cathay, understood that an agreement had been reached and believes that a consensual forbearance agreement was in fact reached. The Debtor provided Cathay with requested documents and addressed all concerns raised by Cathay. The Debtor was of the belief that Cathay would welcome continued operations by the Debtor, especially when the cash flow shortfalls of the Debtor were funded through assets which were not subject to Cathay's security interest. Unfortunately, Cathay decided to take an aggressive approach and commenced judicial foreclosure proceedings, including initially seeking the appointment of a receiver over the Hotel, which was withdrawn by Cathay the day prior to the hearing on the receivership action scheduled for December 3, 2010.

Publicity regarding the repeated foreclosure filings and receivership action caused senseless financial harm to the Hotel and its operations. Vendors were losing faith in the Debtor, and Hotel employees were concerned about job security. Guest services also suffered, prejudicing the Hotel as well as the "Shilo Inns" good franchise brand identity and reputation.

Notwithstanding the foregoing, the Debtor continued to try to negotiate with Cathay in good faith up to the filing of this petition. Based on such discussions, it became evident that Cathay was not interested in reaching a resolution prior to a foreclosure sale of the Hotel scheduled for December 7, 2010. In order to avoid continued harm to the Hotel, employee

1  morale and likely irreparable harm to creditors in the event of a foreclosure, the Debtor was left

2  with no other practical alternative and determined that the commencement of this case was

3  necessary and proper in order to preserve the value of the Hotel for the benefit of all creditors,

4  employees, customers and other parties in interest.

5

6  What follows is a **brief** description of the Debtor's business and future business plans. Further

7  details relating to the Debtor's financial condition and post-confirmation operation of the Debtor

8  are found in sections X, XI, XII, XVI, and XV.

9     As discussed above, the Debtor operates a 160 all-suite full-service hotel located in Killeen,

10  Texas pursuant to a franchise agreement with SFI. The Debtor intends to continue in this business.

11     Prior to the commencement of this case, and after the filing, the Debtor continued to

12  analyze its operations to increase revenues and decrease expenses, for greater profitability. The

13  Debtor has been successful in achieving such goals, but continues to use best efforts to improve

14  Hotel operation efficiencies.

15     First, Shilo Management Corporation ("SMC"), the Debtor's management company,

16  retained a new Director of Marketing and Sales in January 2011 to help further promote the

17  Debtor. The new Director has exciting new plans to help expand the Shilo brand and market the

18  Shilo name in Central Texas.

19     Second, in mid-2010, Shilo reorganized and brought in a new Director of Restaurants,

20  who brought his own team, and they have implemented a much more cost-efficient and exciting

21  plan for the Shilo Inn restaurant located on the premises of the Killeen Hotel, which naturally

22  helps bring business to the Killeen Hotel. In fact, local news has already carried stories about the

23

24  exciting and refreshing changes that have been made to the restaurant.

25     Third, the Debtor expects substantial group business coming in 2011. For 2010, the

26  Debtor acquired approximately $1,044,000 in group business and is confident it will far exceed

27  that amount, as Debtor is already at approximately $700,000 in advance-bookings for 2011 as of

28

January 2011. Another change over 2010 is that Debtor is dealing with more corporate travel. The Debtor averages approximately $38,000 per month from only six (6) of the Debtor's top corporate contracted clients.

Transient business seems to be bustling and will continue with the proximity of Fort Hood. Killeen has a regional Airport bringing in a significant amount of travel to Central Texas with over 40 flights from American Eagle and Continental. Texas A &M is building a campus in Killeen next to the Central Texas College site. Killeen also has almost 100 churches from which Debtor receives business from their guests and special speakers. Central Texas is one of the fastest growing areas in the nation and it can be seen with the local improvements.

Fourth, Killeen is growing rapidly due to the presence of Fort Hood. Killeen is looking at growing to 122,000 people this year with Fort Hood housing approximately 60,000 in Army personnel, bringing the area to over 180,000 people. Fort Hood is the main reason for a majority of the travel to the Killeen area. Fort Hood is also in the process of expanding Darnel Medical Center and is expected to complete the expansion in 2011. It will be one of the largest medical facilities in the military - second only to Walter Reed Medical Center in Washington D.C. - treating spine and head injuries for substantially all the military services. The Debtor believes that this will bring additional business to the area for families needing a place to stay while their family member is being treated.

Finally, Shilo has been providing financial and service support to the local community to help further its goodwill in the Killeen community. In 2010, Shilo contributed to the construction of the Fort Hood memorial to be constructed next to the Debtor's property in honor of the servicemen and women who lost their lives in the tragic 2010 Fort Hood shooting. It is Debtor's plan to remain a highly regarded fixture in the Killeen community and, as Shilo has always done since inception, continue to support its servicemen and women. This positive

presence in the community will reinforce the Shilo Inn Suites Hotel as the "go to" full-service hotel, restaurant, and meeting facility in the Killeen community for many years to come.

## VIII.  CRITICAL PLAN PROVISIONS

Listed below are the sources of money earmarked to pay creditors and interest-holders.

a.    Debtor's cash on hand as of the Effective Date of the Plan; and

b.    Future earnings from continued operations of the Debtor.

Non-insider general unsecured creditors can expect to have their claims paid in full (100%) as follows:

a.    The first payment will be made on the Effective Date of the Plan, which is anticipated to be on June 1, 2011, in the aggregate amount of $47,250;

b.    The Reorganized Debtor will make three (3) additional payments, each in the amount of $47,250 in months 2, 3 and 4 following the Effective Date, for a total payout to non-insider general unsecured creditors in the amount of $189,000, which the Debtor believes constitutes 100% payment, excluding interest.   Non-insider general unsecured creditors can expect to receive their pro rata share of each payment made by the Reorganized Debtor, until such time as 100% of allowed claims are paid in full.

## IX.    DESCRIPTION AND TREATMENT OF CLAIMS

a.    Overview of Plan Payments

Below is a summary of who gets paid what and when and from what source.  The identity of members within a particular class is explained beginning on the next page.   The second column lists two amounts.  First, the amount of each payment, or if only one is to be made, then that amount; second, the total amount that will be paid.  The Proponent is usually not required by law to pay an unsecured creditor or interest holder everything it would otherwise be entitled to, had a bankruptcy case not commenced.  The "Payment Due Date" column states the frequency with which payments will be made and the starting and ending dates.  Look at the starting date to figure out who will be paid before and after you and in what amount.  The "Source of Payment"

1   column describes the expected source of payment.   Further details regarding the source of

2   payment are found in sections X and XI.

3        The timing of payments to many creditors is determined by the "Effective Date."

4   Administrative claims, unless otherwise stated, must be paid by the Effective Date.   The timing

5   of payments to impaired creditors is measured from the Effective Date.   In this case, the

6   Effective Date of the Plan (the "Effective Date") will be June 1, 2011, assuming that the

7   Bankruptcy Court has entered an order confirming the Plan (the "Plan Confirmation Order") at

8   least 14 days prior to June 1, 2011 and there is no stay in effect, in which case the Effective Date

9   shall be the first business day after the stay is no longer in effect with respect to the Plan

10  Confirmation Order.   The Debtor, following the Effective Date, will be referred to herein as the

11  "Reorganized Debtor."

12

| Payment Recipient | Amount of each Payment and Total Amount to be paid | Payment Due Date | Source of Payment |
|---|---|---|---|
| Levene, Neale, Bender, Yoo & Brill L.L.P. (bankruptcy counsel to the Debtor) | Total amount of approximately $100,000* to be paid in four (4) payment, each in the amount of $25,000.<br><br>*estimated unpaid fees and expenses in excess of any pre-petition retainer paid in the amount of approximately $50,000 | Payment shall be made upon the later of (1) Effective Date, and (2) 14 days after date of entry of order allowing the final fee application, provided that payments will be funded into LNBYB's trust account on a monthly basis, commencing on the Effective Date and three (3) additional months thereafter | Reorganized Debtor's cash on hand available on Payment Due Date |

| Payment Recipient | Amount of each Payment and Total Amount to be paid | Payment Due Date | Source of Payment |
|---|---|---|---|
| Class 1 – Allowed Secured Claim of Tax Appraisal District of Bell County (property taxes) | Total amount of $161,673.94 plus interest from the Effective Date at 12% per annum | Month 1:$46,500.00 Month 2: $46,500.00 Month 3: $46,500.00 Month 4: $46,398.00 | Post-confirmation income of Reorganized Debtor |
| **IMPAIRED** | Three (3) payments of $46,500 with a final payment of $46,398, for total payments of $185,898.\n\n100% to be paid. | | |
| Class 2 – Allowed Secured Claim of Cathay Bank\n\n**IMPAIRED** | Total amount of $15,350,000\n\n100% to be paid. | Interest only payments for first 24 months, in the amount of $47,968.75 per month. After first 24 months (June 2013), loan convert to fully amortizing loan based on a 28 year amortization, with payments in the amount of $73,856.16 per month. | Post-confirmation income of Reorganized Debtor |
| Class 3 – Allowed Unsecured Claims, excluding Insiders\n\n**IMPAIRED** | Total amount estimated to be $189,000[1] est.\n\n100% to be paid (excluding interest) | Effective Date: $47,250, plus additional payments of $47,250 for three (3) additional months following the Effective Date | Post-confirmation income of Reorganized Debtor |
| Class 4 – Allowed Unsecured Claims of Insiders\n\n**IMPAIRED** | Total amount estimated to be $505,000 est.\n\n100% to be paid | No payments shall be made until such time as all Class 3 claims are paid in full, which is anticipated to occur by the conclusion of | Post-confirmation income of Reorganized Debtor |

[1] KEDC asserts an unsecured claim in the amount of $200,000. Pursuant to the Debtor's obligations to KEDC, $50,000 of this amount will have become due by the Effective Date, with the balance to be paid $50,000 in 2012, $50,000 in 2013 and $50,000 in 2014. Based on the foregoing, Class 3 treatment includes payment of $50,000 of KEDC's claim, with the balance to be paid pursuant to contract terms.

|  | (excluding interest) | the fourth (4th) month following the Effective Date. After such payments are complete, payments to Class 4 will be made, commencing on Month 4 after the Effective Date and continuing for 15 months thereafter. |

| **Payment Recipient** | **Amount of each Payment and Total Amount to be paid** | **Payment Due Date** | **Source of Payment** |
| --- | --- | --- | --- |
| Class 5 – Interest Holder, Mark S. Hemstreet | No Payments | No Payments | No Payments |

**UNIMPAIRED**

     All claims listed in Exhibit "A" attached hereto are undisputed[2]. On the Effective Date (and on the payment dates as the case may be), the Disbursing Agent will deposit into a segregated account (the "Reserve Account") an amount of cash equal to 100% of the estimated distribution to be paid on the disputed portion of any claim. Cash together with interest accruing thereon will be held in trust for the benefit of holders of disputed claims. No claimant or interest holder is an affiliate of the Debtor, with the exception of those unsecured creditors listed on Exhibit "B" attached hereto.

Below is a detailed description and treatment of administrative expenses, claims and interests

    b.    Administrative Expenses

        i.   These include the "actual, necessary costs and expenses of preserving the estate" as determined by the Court after notice to creditors of a request for

---

[2] As of the date of filing this Plan, the Bar Date to file claims has not passed. As a result, Exhibit "A" hereto includes claims scheduled by the Debtor as undisputed. Debtor reserves the right to amend the attached Exhibit upon the passing of the Bar Date and analysis of claims related thereto.

payment and after a hearing thereon.  These also include the fees and expenses incurred by professionals employed in this case at the expense of the estate which have been approved by the Court on a final basis.

ii.  The Code requires that allowed administrative expenses be paid on the effective date unless the party holding the administrative expense agrees otherwise.  The claimants have not agreed otherwise.

Administrative Expense #1.

**Claimant:  Levene, Neale, Bender, Yoo & Brill L.L.P.**, bankruptcy counsel to the Debtor

- $100,000 (estimated unpaid fees and expenses in excess of pre-petition retainer paid in the amount of $50,0000), subject to court approval.

**TOTAL $100,000 (estimated)**

c.    Unsecured Tax Claims

i.  These include certain types of property, sales, income, and other taxes.

ii.  The Code requires that the holders of such claims receive on account of such claim regular installment payments in cash (i) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such claim; (ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 201 or 303 of the Bankruptcy Code; and (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the Plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code).  The amount of the allowed claim includes the amount of tax owed plus interest of eight percent (8%).  The present value is calculated as of the Effective Date.

To the best of the Debtor's knowledge, no such claims exist in this case.

**TOTAL UNSECURED TAX CLAIMS:   $0**

    d.  **CLASS ONE**

Secured Claim of **TAX APPRAISAL DISTRICT OF BELL COUNTY**

| | |
|---|---|
| Total amount of allowed claim: | $ 161,673.94 |
| Total amount of payments (over time) to satisfy the secured claim: | $185,898 |
| Interest rate (to compensate creditor because claim is paid over time): | 12% per annum |
| Impaired | Yes |
| First payment date: | Effective Date |
| Amount of each installment: | $46,500 for first three (3) month, with payment of $46,398 in fourth month |
| Frequency of payments: | Monthly |
| Total yearly payments: | $185,898 |
| Final payment date: | September 1, 2011 |
| Lien is not modified in any way by the Plan | No lien modification |
| Description of Collateral: | Statutory first priority lien on Debtor's real property. |
| Additional Comments: | The Debtor shall have the right to prepay this claim prior to maturity without penalty or fee. |

e. **CLASS TWO**

Secured Claim of **CATHAY BANK**

| | |
|---|---|
| Total amount of allowed claim: | $15,350,000 |
| Total amount of payments (over time) to satisfy the secured claim: | $25,966,919.76 |
| Interest rate (to compensate creditor because claim is paid over time): | Market interest rate, as may be determined at Plan confirmation hearing, but which the Debtor believes is 3.75% per annum. |
| Impaired | Yes |
| First payment date: | Effective Date |
| Amount of each installment: | Interest only payments for first 24 months, in the amount of $47,968.75 per month. After first 24 months (June 2013), loan convert to fully amortizing loan based on a 28 year amortization, with payments in the amount of $73,856.16 per month. |
| Frequency of payments: | Monthly |
| | All payments due on the 20th of the month, with 10 day grace period |
| Total yearly payments: | $575,625 years 1 & 2 $886,273.92 years 3 through 30 |
| Final payment date: | May 20, 2041 |
| Lien is not modified in any way by the Plan | No lien modification as to lien rights. Terms related to payment of obligation being modified as set forth herein. |
| Description of Collateral: | All real and personal property of the Debtor. |
| Additional Comments: | The Debtor shall have the right to prepay this claim prior to maturity without penalty or fee. |
| | Debtor shall open a segregated tax impound account and shall make necessary deposits to insure timely property tax payments. |
| | Existing personal guaranty of Mark S. Hemstreet shall remain unaffected (reduced to 25% of Debtor's obligations per pre-petition agreement) |

f.  **CLASS THREE**

All General <u>Unsecured Claims Excluding Insiders</u>

See Exhibit "A" for list of claimants and amount owed each:

| | |
|---|---|
| Total amount of allowed claims: | Estimated to be approx. $189,000 |
| Total amount of payments (over time) to satisfy the claims: | $189,000 (100% of allowed claims) |
| Interest rate: | None |
| Impaired | Yes |
| First payment date: | Effective Date |
| Amount of each installment: | $47,250 |
| Frequency of payments: | Four (4) monthly payments, commencing on effective Date and three (3) additional months thereafter. |
| Total yearly payments: | $189,000 |
| Final payment date: | September 1, 2012 |
| Additional Comments: | Such treatment shall be in full and complete satisfaction of all Class 3 claims |

///
///
///
///
///
///
///
///
///
///

g. **CLASS FOUR**

Unsecured Claims Of Insiders

See Exhibit "B" for list of claimants and amount owed each:

| | |
|---|---|
| Total amount of allowed claims: | Estimated to be approx. $505,000 |
| Total amount of payments (over time) to satisfy the claims: | $505,000 |
| Interest rate: | None |
| Impaired | Yes |
| First payment date: | October 1, 2011 |
| Amount of each installment: | Varies from $20,000 - $50,000 per month |
| Frequency of payments: | 15 monthly payments, commencing after completion of Class 3 payments, which is anticipated to be on October 1, 2011 and continue until December 1, 2012. |
| Total yearly payments: | 2011 - $100,000<br>2012 - $405,000 |
| Final payment date: | December 1, 2012 |
| Additional Comments: | Insiders have voluntarily subordinated their claims to those of other unsecured creditors of this estate. Additionally, to the extent that there are insufficient funds to make any plan payments during the administrative claim, Class 1, Class 2 and Class 3 repayment periods, Class 4 insider creditors have agreed to defer such payments (Class 4 payments and ongoing ordinary course payments) to ensure that other required Plan payments are made. |

h. **CLASS FIVE**

Equity Interests

Under the Plan, the sole member, Mark S. Hemstreet, shall retain all of his membership interests in the Debtor and shall be unimpaired under the Plan.

## X.    SOURCE OF MONEY TO PAY CLAIMS AND INTEREST-HOLDERS

The Plan cannot be confirmed unless the Court finds that it is "feasible," which means that the Proponent has timely submitted evidence establishing that the Debtor will have sufficient funds available to satisfy all expenses, including the scheduled creditor payments discussed above.  What follows is a statement of projected cash flow for the duration of the Plan.  The focus is on projected cash receipts and cash disbursements.   All non-cash items such as depreciation, amortization, gains and losses are omitted.  A positive number reflects a source of cash; a (negative number) reflects a use of cash.   A more detailed statement of cash flow projections for the duration of Plan payments is attached as Exhibit "C".

|  | Year #1 (2011) | Year #2 (2012) | Year #3 (2013) | Year #4 (2014) | Years 5-28 (2015-2041) |
|---|---|---|---|---|---|
| Net cash flow FROM OPERATING ACTIVITIES: | $1,063,533 | $1,149,240 | $1,220,180 | $1,317,220 | $1,954,349 |
| Yearly plan payments: | $930,179 | $922,804 | $806,837 | $936,274 | $886,274 |
| Net cash available to Debtor after all plan payments made: | $133,354 | $226,436 | $413,343 | $380,946 | $1,068,075 |

Section XV(c) states the assumptions and details surrounding the statement of projected cash flow.

On the Effective Date, the Plan pays the amount of $166,719, which is comprised of the following:

Administrative claims -    $  25,000

Class 1            -    $  46,500

Class 2            -    $  47,969

Class 3            -    $  47,250

TOTAL            $166,719

The Effective Date is projected to occur on June 1, 2011.  As shown by the projected

1  cash flow attached hereto as Exhibit "C," the Reorganized Debtor will have cash on hand of

2  approximately $474,390 around June 1, 2011.  Therefore, the Debtor is expected to have

3  sufficient cash on hand on the Effective Date to make the payments required to be made on the

4  Effective Date.

5  **XI.    FINANCIAL RECORDS TO ASSIST IN DETERMINING WHETHER**

6  **PROPOSED PAYMENT IS FEASIBLE**

7  As discussed above, cash flow projections for the Plan repayment period are attached

8  hereto as Exhibit "C".  Balance sheets, income and expense statements and cash flow statements

9  for the two years prior to the Petition Date are attached as Exhibit "D" hereto.

10  **XII.    ASSETS AND LIABILITIES OF THE ESTATE**

11  a.  Assets

12  The latest available appraisal of the Killeen Hotel, which encompasses substantially all of

13  the Debtor's assets, is attached hereto as Exhibit "E".  The appraisal, which was prepared for

14  Cathay, is dated as of 2007 and values the assets at $23,060,000 on an "as-is" basis and

15  $25,400,000 as "stabilized".  Whether the Plan proposes to sell any of these assets is discussed in

16  section XVI.

17  b.  Liabilities

18  Exhibit "A" shows all claims asserted against the estate, claims whose treatment is

19  explained in detail by section IX.

20  c.  Summary

21  The fair market value of all assets equals approximately $23,060,000.  Total liabilities

22  equal approximately $16,205,673.94.

23  **XIII.    TREATMENT OF NONCONSENTING CLASSES**

24  As stated above, even if all classes do not consent to the proposed treatment of their

25  claims under the Plan, the Plan may nonetheless be confirmed if the dissenting classes are treated

26  in a manner prescribed by the Code.  The process by which dissenting classes are forced to abide

27  by the terms of a plan is commonly referred to as "cramdown."  The Code allows dissenting

28

1   classes to be crammed down if the Plan does not "discriminate unfairly" and is "fair and

2   equitable." The Code does not define discrimination, but it does provide a minimum definition

3   of "fair and equitable." The term can mean that <u>secured claimants</u> retain their liens and receive

4   cash payments whose present value equals the value of their security interest. For example, if a

5   creditor lends the Debtor $100,000 and obtains a security interest in property that is worth only

6   $80,000, the "fair and equitable" requirement means that the claimant is entitled to cash

7   payments whose present value equals $80,000 and not $100,000. The term means that <u>unsecured</u>

8   <u>claimants</u> whose claims are not fully satisfied at least know that no claim or interest that is junior

9   to theirs will receive anything under the Plan, except where the Debtor is an individual, has

10  elected to retain property included in the Estate under 11 U.S.C. § 1115 and has satisfied 11

11  U.S.C. § 1129(b)(2)(B)(ii). "Fair and equitable" means that each <u>holder of an interest</u> must

12  receive the value of such interest or else no junior interest is entitled to receive anything.

13          Therefore, if a class of general unsecured claims votes against the Plan, the Plan cannot

14  be confirmed where the Debtor or a class of interest holders (e.g. shareholders or partners) will

15  receive or retain any property under the Plan, <u>unless</u> the Plan provides that the class of general

16  unsecured claims shall be paid in full with interest. If a class of interest holders votes against the

17  Plan, the Plan cannot be confirmed where the Debtor will receive or retain any property under

18  the Plan, unless the Plan provides that the class of interest holders shall be paid in full with

19  interest. These are complex statutory provisions and the preceding paragraphs do not purport to

20  state or explain all of them.

21  ## XIV.   TREATMENT OF NONCONSENTING MEMBERS OF CONSENTING CLASS

22  ## (CHAPTER 7 LIQUIDATION ANALYSIS)

23          The Plan must provide that a nonconsenting impaired claimant or interest holder of a

24  consenting class receive at least as much as would be available had the Debtor filed a Chapter 7

25  petition instead.

26          In a Chapter 7 case the general rule is that the Debtor's assets are sold by a trustee.

27  Unsecured creditors generally share in the proceeds of sale only after secured creditors and

28

administrative claimants are paid. Certain unsecured creditors get paid before other unsecured creditors do. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the total amount of allowed claims.

A creditor would recover from the assets of the bankruptcy estate less under Chapter 7 than under Chapter 11 for at least three reasons. First, the recovery by unsecured creditors in a liquidation would be less than the recovery proposed under the Plan because the trustee would in all probability be unable to realize the full value of all of the Debtors' assets, including the inventory. Upon liquidation, a trustee would face the difficulties of processing, marketing and obtaining value for the Debtor's assets on a distressed sale basis. Thus, in a liquidation, the value of the Debtor's assets would, in all likelihood, decrease considerably from the current market values. The value would further be decreased based on the fact that, in a liquidation, the Debtor would lose its "Shilo Inn" flag and any liquidation sale would therefore include a no-name hotel. The "Shilo Inn" is a highly respected and valuable asset which would be lost based on the provisions of the franchise agreement with SFI.

Second, in a chapter 7 case, a trustee is appointed and is entitled to compensation from the bankruptcy estate in an amount no more than 25% of the first $5,000 of all moneys disbursed, 10% on any amounts over $5,000 and up to $50,000, 5% on all amounts over $50,000 and up to $1,000,000, and such reasonable compensation no more than 3% of moneys over $1,000,000. Therefore, the distribution to creditors will be diluted further by the trustee's compensation.

Third, the current economic market would further depress the value of the Killeen Hotel in a liquidation. Specifically, two of the Debtor's competitors were forced into Chapter 7 liquidations in early 2010 and, as of today's date, they remain "dark". This has significant impact on the value of a hotel property, as deferred maintenance will significantly devaluate the hotels, and would devaluate the Killeen Hotel. The nearby "dark" hotel properties create an oversupply of REO hotel assets, which gives potential buyers an advantage of choice and depresses hotel values in the entire market, thus further devaluing this Killeen Hotel in the event

of a liquidation. Conversely, with the significant REO hotel assets, the Killeen Hotel is poised to gain, and has gained, a significant amount of their business as of 2010. Liquidating the Debtor's assets would trend the business elsewhere for many years to come until a new "brand" can establish itself in the local community.

If a liquidation was initiated, it would put this Killeen Hotel squarely in Killeen public eye and significantly reduce the value of the assets. The adverse publicity surrounding a liquidation scenario would be highly detrimental to the property's reputation in the community, its business activities, and a subsequent value in a liquidation. Shilo has proven to be a very efficient and cost-conscious company in how it operates the Killeen Hotel through its affiliate management company, SMC. In a liquidation, the reservation service and related amenities provided by the Shilo franchise and SMC terminate. Even a short term disruption in the reservation process would have a dramatic impact on the Killeen Hotel and its business. Existing reservations would likely be lost (many years in advance) and new reservations would not be able to be made. The adverse public relations associated with such disruption would be drastic. The Debtor believes that such disruption would result in an additional discount of 10% to the value of the Killeen Hotel in a liquidation.

Over the past three (3) years, Shilo has taken great strides to imbed itself into the Killeen community and to become a fixture for years to come. Shilo has invested heavily into the local community, and Shilo has a well-established reputation of supporting our troops, and is well-recognized in the nearby Fort Hood community. This is reflected by the strong support Shilo has received from the Killeen Economic Development Corporation (KEDC) and other local organizations. SFI, as the franchisor, has significant value and helps bring the strong west coast Shilo presence to Texas. In the event of a liquidation, the Shilo flag would be pulled from the Killeen Hotel pursuant to the terms of the franchise agreement and would result in an additional approximate 20% diminution in value to the Hotel.

The Debtor believes that the foregoing factors would result in not less than a 30% reduction in value of the Killeen Hotel in the event of a liquidation.

|  | Chapter 7 | Chapter 11 |
|---|---|---|
| Value of Assets **(Based on explanation above)** | $14,850,640[3] | $23,060,000 (See Exhibit "E") |
| Administrative Expenses | $100,000 (est.) | $100,000 (est.) |
| Class 1 Secured Claim | $185,898 | $185,898 |
| Class 2 Secured Claim | $15,350,000 | $15,350,000 |
| Priority Unsecured Claims | $0 | $0 |
| Chapter 7 Trustee Fee | $250,000 est. | N/A |
| Exemption(s) | N/A | N/A |
| TOTAL AVAILABLE FOR DISTRIBUTION TO GENERAL UNSECURED CREDITORS | $0 | $7,424,102 |
|  | Unsecured creditors receive payment of 0% of total claims | Unsecured creditors receive payment of 100% of total claims |

## XV.    FUTURE DEBTOR

a.    <u>Management of Debtor</u>

i.    ***Names of persons who will manage the Debtor's business affairs***:   The pre-petition management of the Debtor will remain and continue to manage the Debtor's business affairs following confirmation of the Plan.   SMC will continue to act as the Debtor's management company. Mark S. Hemstreet will continue to be the sole member of the Debtor.

ii. ***Proposed compensation to persons listed above***:   The Debtor does not employ management and, therefore, does not compensate such persons.   Instead, the Debtor is managed by SMC and pays to SMC a management fee equal to 4% per month of adjusted gross revenue. After confirmation of the Plan, management fees will remain unchanged.

iii.    ***Qualifications***:   SMC employs all Shilo employees, including those that work at the Killeen Hotel.   SMC manages all of the Shilo "flagged" properties in a very efficient

---

[3] Calculated as current value of $23,060,000 less 30% discount as discussed above, resulting in a value of $16,142,000, less cost of sale, estimated to be 8%, resulting in a final value of approximately $14,850,640.

1   and cost effective manner. SMC prides itself on keeping its labor, material and services costs to

2   a minimum, while at the same time providing maximum services for the Debtor's customers and

3   vendors.

4          iv.    ***Affiliation of persons to Debtor***:  Mark S. Hemstreet is the sole member

5   of the Debtor.  SMC is the management company of the Debtor.  SMC also manages all other

6   "Shilo Inn" hotels.

7          v.    ***Job description***: SMC will continue to oversee the general operations of

8   the Debtor's business on a day-to-day basis and takes all steps and actions necessary to ensure

9   and maintain the smooth and successful operation of the business.

10         b.    Disbursing Agent

11         SMC, as the management of the Reorganized Debtor, is responsible for collecting money

12  intended for distribution to claimants and transmitting it to them.  The disbursing agent's address

13  and telephone number are: Shilo Management Corporation, 11600 SW Shilo Lane, Portland, OR

14  97225-5995, Tel: (503) 641-6565.

15         i.    ***Proposed compensation to person listed above***:  With the exception of its

16  4% management fee in connection with operations, SMC shall serve as the disbursing agent

17  under the Plan without compensation or bond.

18         ii.    ***Qualifications***:  Given that the primary source of the payments required to

19  be made under this Plan is the Debtor's cash on hand as of the Effective Date and the Debtor's

20  post-confirmation income, the Debtor believes that SMC, as management of the Debtor, is the

21  best qualified to serve as the disbursing agent.  Christopher Campbell, the CEO and CFO of

22  SMC, will oversee, supervise and ensure that SMC competently performs the tasks of a

23  disbursing agent.  SMC, the Reorganized Debtor and Mr. Campbell are familiar with the claims

24  in this case and the terms of the Plan; thus, they are qualified to implement the Plan's provisions

1 │ and make the necessary disbursements.

2 │       iii.    ***Affiliation of person to Debtor***:   SMC manages all of the Debtor's

3 │ operations and financial matters.  Mr. Campbell is the CEO and CFO of SMC and intimately

4 │ familiar wit the Debtor's operations and the provisions of the Plan.

5 │       iv.    ***Job description***:   The disbursing agent shall make all distributions in

6 │ accordance with the provisions of the Plan.   SMC shall be the disbursing agent responsible for

7 │ collecting all of the money intended for distribution to the Debtor's claimants and transmitting it

8 │ to them.

9 │     c.   Future Financial Outlook

10 │     The Proponent believes that the Debtor's economic health will improve from its pre-

11 │ bankruptcy state.  Some of the reasons for the improvement, as discussed above, are as follows:

12 │     First, SMC, the Debtor's management company, retained a new Director of Marketing and

13 │ Sales in January 2011 to help further promote the Debtor.  The new Director has exciting new

14 │ plans to help expand the Shilo brand and market the Shilo name in Central Texas.

15 │     Second, in mid-2010, Shilo reorganized and brought in a new Director of Restaurants,

16 │ who brought his own team, and they have implemented a much more cost-efficient and exciting

17 │ plan for the Shilo Inn restaurant located on the premises of the Killeen Hotel, which naturally

18 │ helps bring business to the Killeen Hotel.  In fact, local news has already carried stories about the

19 │ exciting and refreshing changes that have been made to the restaurant.

20 │     Third, the Debtor expects substantial group business coming in 2011.  For 2010, the

21 │ Debtor acquired approximately $1,044,000 in group business and is confident it will far exceed

22 │ that amount, as Debtor is already at approximately $700,000 in advance-bookings for 2011 as of

23 │ January 2011.  Another change over 2010 is that Debtor is dealing with more corporate travel.

The Debtor averages approximately $38,000 per month from only six (6) of the Debtor's top corporate contracted clients.

Transient business seems to be bustling and will continue with the proximity of Fort Hood. Killeen has a regional Airport bringing in a significant amount of travel to Central Texas with over 40 flights from American Eagle and Continental. Texas A &M is building a campus in Killeen next to the Central Texas College site. Killeen also has almost 100 churches from which Debtor receives business from their guests and special speakers. Central Texas is one of the fastest growing areas in the nation and it can be seen with the local improvements.

Fourth, Killeen is growing rapidly due to the presence of Fort Hood. Killeen is looking at growing to 122,000 people this year with Fort Hood housing approximately 60,000 in Army personnel, bringing the area to over 180,000 people. Fort Hood is the main reason for a majority of the travel to the Killeen area. Fort Hood is also in the process of expanding Darnel Medical Center and is expected to complete the expansion in 2011. It will be one of the largest medical facilities in the military - second only to Walter Reed Medical Center in Washington D.C. - treating spine and head injuries for substantially all the military services. The Debtor believes that this will bring additional business to the area for families needing a place to stay while their family member is being treated.

Finally, Shilo has been providing financial and service support to the local community to help further its goodwill in the Killeen community. In 2010, Shilo contributed to the construction of the Fort Hood memorial to be constructed next to the Debtor's property in honor of the servicemen and women who lost their lives in the tragic 2010 Fort Hood shooting. It is Debtor's plan to remain a highly regarded fixture in the Killeen community and, as Shilo has always done since inception, continue to support its servicemen and women. This positive

1  presence in the community will reinforce the Shilo Inn Suites Hotel as the "go to" full-service

2  hotel, restaurant, and meeting facility in the Killeen community for many years to come.

3      Section X provides a summary of the projected cash flow of the Debtor for the duration

4  of the Plan.  The assumptions that underlie the projections are set forth in Exhibit "C" attached

5  hereto.  As previously stated, Plan payments will primarily come from the continued operation of

6  the Debtor's business.  If the business generates insufficient funds to provide all of the Plan

7  payments, then SMC, as the management of the Reorganized Debtor, and SFI, as the franchisor,

8  will contribute the funds necessary to make up the shortfall.  In the alternative, the Reorganized

9  Debtor may pursue the sale of its assets which has equity to the extent necessary for the

10  Reorganized Debtor to meet its payment obligations under the Plan.

11

12

13  **XVI.   SALE OR TRANSFER OF PROPERTY; ASSUMPTION OF CONTRACTS AND**

14  **LEASES; OTHER PROVISIONS**

15      The Plan provides for the following:

16      The Plan does not provide for the sale or transfer of any property of the Debtor.

17      With regard to contracts and leases, the Debtor shall file, by not later than 14 days prior

18  to the confirmation hearing, a list identifying the unexpired leases and executory contracts that it

19  intends to assume in connection with confirmation of the Plan (the "Assumption List").  On the

20  Effective Date of the Plan, the Debtor shall **assume** all unexpired leases and executory contracts

21  that are identified on the Assumption List.  All unexpired leases and executory contracts that are

22  not identified on the Assumption List, and that have not been previously rejected by the Debtor,

23  shall be deemed rejected as of the Effective Date.

24      The Court must make certain findings of fact before approving the aforementioned

25  provisions as part of the Plan.  The Proponent will request that the Court make the appropriate

26  findings at the confirmation hearing, based upon evidence submitted in support of the

27  confirmation motion.

28

# XVII. BANKRUPTCY PROCEEDINGS

Following the Petition Date, the Court has authorized the employment of the following professionals:

1.    Levene, Neale, Bender, Yoo & Brill L.L.P. as bankruptcy counsel to the Debtor (order entered on January 28,, 2011).

Additionally, the following orders have been entered by the Court:

| Date | Docket Number | Description |
|------|---------------|-------------|
| 12/08/2010 | 11 | Order (1) Requiring Debtor-In-Possession to appear at Status Conference and file report on status of reorganization case, or face possible (A) Conversion of case to Chapter 7; (B) Dismissal of case; or (C) Appointment of Trustee; (2) Setting hearing on status of reorganization case; and (3) Establishing procedure for (A) Motion for order approving Adequacy of Disclosure Statement; and (B) Motion for order confirming plan (Related Doc # 1 ) Signed on 12/8/2010 (Kaaumoana, William) (Entered: 12/08/2010) |
| 12/17/2010 | 20 | Order: (1) Authorizing debtor to use cash collateral on an interim basis pending a final hearing and to borrow money on a secured basis; and (11) Setting a final hearing on debtor's use of cash collateral. (Related Doc # 2 ) Signed on 12/17/2010 (Peters, Sandra) (Entered: 12/17/2010) |
| 12/22/2010 | 23 | Order Granting Motion for Continuation of Utility Service and Approval of Adequate Assurance of Payment to Utility Company Under Section 366(b) (See order for further information) (Related Doc # 4 ) Signed on 12/22/2010 (Peters, Sandra) (Entered: 12/22/2010) |
| 1/14/2011 | 34 | Order Granting Debtor's emergency motion for entry of an order authorizing the continued use of debtor's cash management system (Related Doc # 3 ) Signed on 1/14/2011 (Peters, Sandra) (Entered: 01/14/2011) |
| 1/28/2011 | 50 | Order after initial status conference in chapter 11 case: 1) Setting deadline for filing proofs of claim and requiring compliance with local bankruptcy rule 3001-1 2) Setting deadline for hearing on objections to claims; and 3) Setting hearing on motion for order approving adequacy of disclosure statement (See order for further information) (Related Doc # 11 ) Signed on 1/28/2011 (Peters, Sandra) (Entered: 01/28/2011) |
| 1/28/2011 | 51 | Order Granting Application to Employ Levene Neale Bender Yoo & Brill LLP as Bankruptcy Counsel(Related Doc # 29 ) Signed on 1/28/2011. (Peters, Sandra) (Entered: 01/28/2011) |

# XVIII. TAX CONSEQUENCES OF PLAN

The tax consequences of the Plan are in many cases uncertain and many vary depending on the individual circumstances of the holders of claims and interests. The tax consequences of the Plan to a holder of a claim will depend, in part, on the type of consideration received for the

1  claim, whether the holder is a resident of the United States for tax purposes, and whether the

2  holder reports income on the accrual or cash basis method.   Holders of claims likely will

3  recognize gain or loss, as the case may be, equal to the difference between the amount realized

4  under the Plan in respect of their claims and their respective tax basis in their claims.   The

5  amount realized for this purpose generally will equal the sum of cash and the fair market value of

6  any other consideration received under the Plan in respect of their claims.   Any gain or loss

7  recognized in the exchange will be capital or ordinary depending on the status of the claim in the

8  holder's hands.

9       PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THIS PLAN

10  SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS.

11  THE PROPONENTS MAKE THE AFOREMENTIONED DISCLOSURE OF POSSIBLE TAX

12  CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS OF TAX ISSUES

13  THEY MAY WISH TO CONSIDER. THE PROPONENTS CANNOT AND DO NOT

14  REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE

15  COMPLETELY ACCURATE BECAUSE THE TAX LAW EMBODIES MANY

16  COMPLICATED RULES, WHICH MAKE IT DIFFICULT TO ACCURATELY STATE

17  WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.

18  **XIX.   EFFECT OF CONFIRMATION OF PLAN**

19       a.   General comments

20       The provisions of a confirmed Plan bind the Debtor, any entity acquiring property

21  under the Plan, and any creditor, interest holder, or general partner of the Debtor, even those who

22  do not vote to accept the Plan.

23       The confirmation of the Plan vests all property of the estate in the Reorganized

24  Debtor.

25       The automatic stay is lifted upon confirmation as to property of the estate.

26  However, the stay continues to prohibit collection or enforcement of pre-petition claims against

27  the Debtor or the Debtor's property until the date the Debtor receives a discharge, if any.  If the

28

1    Debtor does not seek a discharge, the discharge is deemed denied, and the stay as to the Debtor

2    and the Debtor's property terminates upon entry of the order confirming the Plan.

3              b.   Discharge of liability for payment of debts; status of liens; equity security holders

4              Unless the Debtor is not entitled to receive a discharge pursuant to 11 U.S.C.

5    1141(d)(3), the debtor may obtain a discharge only upon specific order of the Court.    The

6    confirmation of the Plan does not discharge the Debtor from any debt of a kind specified in

7    Sections 523(a)(2)(A)-(B) of the Bankruptcy Code (West 2004 & Supp 2006) that is owed to a

8    domestic governmental unit, or owed to a person as the result of an action filed under subchapter

9    III of chapter 37 or title 31 or any similar State statute or for a tax or customs duty with respect

10   to which the debtor made a fraudulent tax return or willfully attempted in any manner to evade or

11   to defeat such tax or such customs duty.

12             c.   Modification of the Plan

13             The Proponent may modify the Plan pursuant to 11 U.S.C. § 1127.

14             d.   Post-Confirmation Causes of Action

15   To the best knowledge of the Proponent, the estate has the following causes of action:

16   The Debtor believes that the estate may hold claims and causes of action against Cathay and

17   related parties in connection to pre-petition conduct which may rise to the level of lender

18   liability.    In addition, the Debtor holds claims against Cathay with respect to an avoidable

19   transfer related to Cathay recording a UCC-! Financing Statement with respect to property of the

20   Debtor's estate on the even of this bankruptcy filing.    The Debtor, or the Reorganized Debtor,

21   however the case may be, will continue to investigate such claims and, if appropriate, pursue

22   appropriate claims after Plan confirmation.

23   Other than the foregoing, the Debtor does not believe that it has any significant avoidance

24   causes of action.    The Reorganized Debtor is designated as representative of the estate under 11

25   U.S.C. § 1123(b)(3) and shall have the right to assert any or all of the above causes of action

26   post-confirmation in accordance with applicable law.

27

28

e.  <u>Final Decree</u>

Once the Plan has been consummated, a final decree may be entered upon motion of the Proponent. The effect of the final decree is to close the bankruptcy case. After such closure, a party seeking any type of relief relating to a Plan provision can seek such relief in a state court of general jurisdiction.

Dated: February 7, 2011

SHILO INN, KILLEEN, LLC

By:    CHRIOSTOPHER CAMPBELL
Its:    Authorized Agent

Presented By:
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

By:    /s/ David B. Golubchik
       DAVID B. GOLUBCHIK
       JOHN-PATRICK M. FRITZ
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
Attorneys for Chapter 11 Debtor and Debtor in Possession

## XX. DECLARATION IN SUPPORT OF DISCLOSURE STATEMENT AND PLAN

<u>Declaration of Christopher Campbell</u>

I, Christopher Campbell, declare under penalty of perjury under the laws of the United States of America that the following statements are true and based upon personal knowledge.

1.      I am over 18 years of age.  I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am currently employed as the Chief Executive Officer and Chief Financial Officer of Shilo Management Corporation ("SMC"), the entity that oversees operation and management of Shilo Inn hotels, including the hotel operated by Shilo Inn Killeen, LLC, the debtor and debtor in possession herein ("Debtor").

3.      I hold an MBA from Golden Gate University (2003).  I also hold a BA in Business Administration from University of Washington (1992).  Both degrees were awarded to me with high honors and a concentration in finance.

4.      I was hired as Deputy Chief Financial Officer of Shilo Inns on March 1, 2003.  My duties in such capacity including overseeing accounting functions and management of staff, including in-house payroll, purchasing, accounts payable and general ledger departments.

5.      On June 1, 2004, I was promoted to Chief Financial Officer of Shilo Inns.  In such capacity, I oversee all accounting functions and provide management and third parties with historical and proforma financial information.   On April 17, 2007, I was promoted to Chief Executive Officer of Shilo Inns and continue to serve in such capacity while also serving as the CFO.

6.      David B. Golubchik and J.P. Fritz of Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB") are the individuals at LNBYB who prepared this document.  Mr. Golubchik and Mr.

in connection with its chapter 11 bankruptcy case.

7.     The source of all financial data is Debtor's books and records, which are maintained in the ordinary course of business of the Debtor.

8.     All facts and representations in the Plan and Disclosure Statement are true to the best of my knowledge.

9.     No fact material to a claimant or equity security holder in voting to accept or reject the proposed Plan has been omitted.

10.    The name of the person who prepared the cash flow projections and the other financial documents is Christopher Campbell (myself), in my capacity as Chief Financial Officer of Shilo Inns.

11.    The accounting method used to prepare the cash flow projections and the other financial documents is Income Tax-Basis, subject to assumptions as are inherently required in making projections.

Executed on this 7th day of February 2011, at Portland, Oregon.

CHRISTOPHER CAMPBELL

| In re  SHILO INN, KILEEN, LLC | CHAPTER  11 |
| Debtor(s). | CASE NO 2:10-bk-62057-VZ |

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Blvd., Ste. 1700, Los Angeles, CA  90067

A true and correct copy of the foregoing document described as: **DISCLOSURE STATEMENT AND PLAN OF REORGANIZATION FOR DEBTOR SHILO INN, KILLEEN, LLC** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **February 7, 2011** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- John-patrick M Fritz    jpf@lnbrb.com
- David B Golubchik    dbg@lnbrb.com
- Dare Law    dare.law@usdoj.gov
- Michael Reed    othercourts@mvbalaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Brandon J Witkow    bwitkow@lockelord.com

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **February 7, 2011** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

*None.*

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 7, 2011** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

***Via Attorney Service***
Hon. Vincent P. Zurzolo
U.S. Bankruptcy Court
255 E. Temple Street, Ctrm 1368
Los Angeles, CA  90012

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| February 7, 2011 | Stephanie Reichert | /s/ Stephanie Reichert |
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009* 
**F9013-3.1**